**Nicklas SACCO**

v.

**David MATHEWS, as Secretary of Health, Education and Welfare.**

Civ. A. No. 76–1354.

United States District Court,
E. D. Pennsylvania.

Nov. 9, 1976.

A. John Miernicki, Shenandoah, Pa., for plaintiff.

David W. Marston, U. S. Atty., Philadelphia Pa., for defendant.

MEMORANDUM

TROUTMAN, District Judge.

This is a so-called "Black Lung" case arising under Part B, Title IV of the Federal Coal Mine Health and Safety Act, 30 U.S.C. 901 *et seq.* Said Act establishes a program for the payment of benefits to living miners who are totally disabled due to pneumoconiosis arising out of coal mine employment and to the dependents of miners who die due to pneumoconiosis, or who were totally disabled due to pneumoconiosis at the time of their death.

The Administrative Law Judge (ALJ) has made, *inter alia,* the following findings:

"(2) The claimant is not now, nor was he heretofore, an employee in a coal mine.

\*      \*      \*      \*      \*      \*

(4) The claimant has no history of coal mining employment."

Benefits were accordingly denied.

Judicial review is normally limited to determining whether the findings of the Secretary are supported by substantial evidence. *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Here, however, the crucial finding; i. e., that the plaintiff was not a miner, is based upon the failure of the plaintiff to meet his burden of proof.

The basis for the ALJ's findings is best stated by him in his evaluation of the evidence from which we quote as follows:

Section 410.110(j) of Regulations No. 10 of the Social Security Administration, as amended September 30, 1972 (20 CFR 410.110(j)) provides:

'"Miner" or "coal miner" means any individual who is working or has worked as an employee in a coal mine, performing functions in extracting the coal or preparing the coal so extracted.'

"Section 410.110(m) of Regulations No. 10 of the Social Security Administration (20 CFR 410.110(m) provides in part:

' "Employee" means an individual in a legal relationship (between the person for whom he performs services and himself) of employer and employee under the usual common law rules'.

"By his application (Exhibit 1), claimant indicated he was employed at Locust Mountain Coal Company from 1926 until 1931, and thereafter, at three facilities of Pennsylvania and Reading Coal and Iron Company from 1931 until 1941. As of December 2, 1971, it was determined by the Social Security Administration that the claimant was disabled from hypertensive vascular disease and angina pectoris (Exhibit 6) and that he had been the operator of a bar and restaurant for the twenty-four years prior thereto. Certification of court record (Exhibit 7) shows that marriage license application of August, 1935 listed claimant's occupation as 'shoemaker'. He first applied for Social Security account number, as a self-employed person, in May, 1941 (Exhibit 8). Report of contact indicated that claimant was not listed as an employee on the records of Pennsylvania and Reading Coal and Iron Company, which maintained excellent records of employees after 1934 (Exhibit 11). Further report of contact (Exhibit 12) indicates vagueness and evasiveness as cause of suspicion of his alleged coal mine employment, noting he admitted he 'had trucked and hauled coal for several years', could not give dates or places of work for a coal mine operator, and was unsure if he had belonged to a union or which union. Claimant was held to be disabled by anthracosilicosis on June 6, 1972, after fifteen years' mining employment, by the Workmen's Compensation Board of Pennsylvania (Exhibit 14). It is noted that claimant and one physician were the sole witnesses. Disability interview of 1971 (Exhibit 15) indicates difficulty in eliciting data from claimant, with, 'I am very forgetful'. History given Dr. Platt (Exhibit 20) by claimant indicates he spend approximately ten to twelve years in the mines; * * *.

\* \* \* \* \* \*

"After testifying to employment at those places indicated upon the supporting statements mentioned and in the application, for the period 1926 until 1941, claimant was examined further by the administrative law judge. He did not know if he had paid tax on coal mine earnings; he did not remember about taxes; he did not know whether Pennsylvania and Reading Coal and Iron Company had paid taxes for itself or taxes for him. Faced with the fact that this corporation, which operates West Shenandoah Colliery, Kehley Run Colliery, and Maple Hill Colliery, maintains employment records and pays into Social Security those taxes withheld from employees, claimant said that he had never worked for the company. Instead, he had worked for one Barney Shoestock, an employee of that company, and a shoemaker. According to claimant, Barney Shoestock was an employee of the company, engaged in loading coal by hand."

(R. 10, 11, 12)

He understandably concluded as follows: "It is the conclusion of the administrative law judge that claimant has presented a case based entirely upon falsehood as to his work history. There is no persuasive evidence that he has ever been engaged as an employee in a coal mine. Those statements which support his claim of such employment are generally specific as to times and places which he now admits to be not fact. The administrative law judge therefore finds such exhibits to be without persuasive force."

(R. 12)

The testimony with which we are primarily concerned is that of the plaintiff, first, on examination by his counsel, and then by the ALJ. We quote from the record the relevant testimony pertaining to the plaintiff's alleged employment as a miner:

"Q. After coming here did you eventually gain your citizenship?

A. Yes, I was a citizen before I came here.

Q. You were a citizen before you came here?

A. Yes, under my father (inaudible) was naturalized 1922.

Q. All right. Now, when you came over in 1926, who did you come over with?

A. I come over with my mother.

Q. Did you work when you got here?

A. Yes.

Q. Where did you work?

A. Locust Coal Company.

Q. All right, and where was Locust Coal Company located?

A. On West Coal Street, all the way down to the end.

Q. All right, when did you begin to work for them?

A. 1926 I—until about 1931, it was.

Q. All right.

A. I don't remember exactly.

Q. That was with Locust Mountain Coal Company in 1926 to about 1931?

A. That's right.

Q. What was your job with them?

A. Pick and slate breaker, was very dusty.

Q. Was that your job the entire time you were there picking slate?

A. Yes.

\*　\*　\*　\*　\*　\*

Q. Where did you work after that?

A. West Shenandoah Coal Company.

Q. Was that a P and R, C and I Company?

A. The company was P and R, C and I.

Q. Where was that colliery?

A. That was across from Coal Street almost from the end of town.

Q. The western end of the town?

A. The western end of town. West Cinder Street.

Q. And what was your job when you were there?

A. Also the same kind of job, (inaudible) under the platform.

Q. So you picked slate there?

A. Slate there.

Q. How long did you stay there?

A. From 1931 until about '34, or something like that.

Q. And where did you go next?

A. Maple Hill.

Q. All right, and was that a P and R, C and I company?

A. Yes. I think it was, I'm not sure.

Q. And that was located in Maple Hill, Pennsylvania?

A. Maple Hill on a road going to Miner City.

Q. Just outside of Shenandoah?

A. Just outside Shenandoah.

Q. And what type of job did you do there?

A. I was a all around man.

Q. You were a laborer?

A. Inside, outside, breaker (inaudible)

Q. And what type of jobs did you do?

A. Scooping coal in the cars.

Q. And how many years were you there?

A. From '34, I guess to about '37, something like that.

Q. Okay, and where did you work then?

A. Then I think (inaudible) gotten what they call a—there was at the east end of Coal Street area.

Q. And what was that designation, was that Keeley Run?

A. Keeley Run, yeah, used to (inaudible)

Q. And you worked there how many years?

A. I don't know exactly, from '37 kind of working on and off. '37 till about '41, or something like that.

\*　\*　\*　\*　\*　\*

ADMINISTRATIVE LAW JUDGE: Pardon me, counsel, what company was that?

MR. MIERNICKI: P and R, C and I. All but Locust Coal would have Philadelphia and Reading (inaudible)

BY MR. MIERNICKI:

Q. So then your testimony is that you worked in the mines continuously

from 1926 until 1941, is that correct?

A. Yes.

\* \* \* \* \* \*

Q. Now, during the time that you were working in and around the various collieries and breakers were you doing any other kind of work?

A. I was doing a little shoe repair.

Q. And where were you doing the shoe repair?

A. On East Coal Street.

Q. Did you have a shop?

A. Well, it was my father's shop (inaudible).

Q. And you were working that on the side?

A. And I learned the trade from my father.

\* \* \* \* \* \*

Q. Did you ever go back in the mines or around the mines after 1941?

A. No, sir.".

(R. 45, 46, 47, 48, 49)

On examination by the ALJ the plaintiff testified:

"Q. Can you tell me what part of 1941 that you quit?

A. '41, I don't remember exactly—it was, what do you call it—(inaudible) and Maple Hill, also in the mines I worked, and then back in the mines (inaudible)

Q. When in 1941 did you leave the mines, at the beginning of the year, at the end of the year, middle of the year, when?

A. Well, at the time they were working like one or two days a week and I don't remember exactly when I left. I don't remember (inaudible)

Q. How long had they been working only one or two days a week?

A. Oh, they were working that way for a long time.

Q. You mean a matter of—

A. (inaudible).

Q. Five years, five months?

A. I can't remember. Four or five years, work was slow.

Q. Speak toward the microphone.

A. About four or five years of working slow time, them days, two or three days something like that.

\* \* \* \* \* \*

Q. How did it happen that you never applied for a social security number until 1941?

A. I don't know. They said that we didn't need to apply something like that. I don't know.

Q. You're testifying you were working even though you had no social security number?

A. Yes, I was.

Q. And for a company that normally makes reports to social security and pays the withholding tax on their employees?

A. I really think that there was some kind of a contractor that was working for them and I was working for this contractor.

Q. You mean, you weren't working for them at all? Well, who were you—

A. The company—with the company.

Q. Well, who were you working for then, sir?

A. Barney Sustak (PHONETIC)

Q. And who is Barney Sustak?

A. He was working around the mines and he was also a shoe repairman and he quit shoe repair and he went to work in the mines.

Q. And just what did Barney do?

A. He was miner.

Q. Do you mean he was employed by them?

A. Yes.

Q. And what was his job?

A. He was miner and working the mines, around the mines.

Q. He was one of their regular employees?

A. I went to work—yes, I guess he was.

Q. Well, what would he be doing hiring you?

A. I don't know.

Q. Well, I don't either. Make me know.

A. <u>I guess he was miner contractor or something like that.</u>

Q. What kind of a contract did he have, did he pursue?

A. He would work in the mines and we were loading the cars with—when the coal come down the chute.

Q. You mean he was loading cars by hand?

A. Yes, yes.

Q. Well, just how many employees did he have there?

A. Was just him and I then. I don't know if he had anymore when I was leaving.

Q. Are you aware of the fact that there's a statement in the file by a man named Jagan?

A. Yes, sir.

Q. Saying that he worked with you for 20 to 25 years. Did he know you only worked for 15?

A. He didn't know that I worked—he was a breaker boss in West Shenandoah.

Q. Are you telling me that he signed the statement that he didn't know how long you worked?

A. Well, I guess he know that I was working around the mines, but he was my boss in West Shenandoah. He was a breaker boss there.

ADMINISTRATIVE LAW JUDGE: I have no further questions.

MR. MIERNICKI: That's all we have."
(Underscoring supplied)

(R. 59, 61, 62, 63)

On the basis of such testimony, without more, the ALJ properly denied benefits and thus found it unnecessary to reach other issues which would follow had the plaintiff established employment as a miner. We shall likewise not reach such "other issues" and shall concern ourselves only with the employment issue.

On this record there is no doubt that the ALJ properly decided the employment issue and properly denied benefits. However, in the interest of justice, we are concerned about the possibility that the plaintiff may have failed to properly and fully express his employment record and that both counsel and the ALJ may have had insufficient knowledge of conditions in the Anthracite Coal region in the 1930's and 1940's to have fully examined the plaintiff and elicited the true facts.[1]

Briefly spoken, the term "contractor" used by the plaintiff first on page 61 of the record and again on page 62 of the record may represent the key to a determination of plaintiff's true employment record. This possibility grows out of the fact that in the Anthracite field, and particularly in the northern field, it was not unusual for a coal mine owner to enter into a contract with a miner, known as a "contract miner" to develop a particular area. Said "contract miner" would then hire his own "miners" or "laborers" who worked for *him*, were paid by him, and did not appear as "employees" on the payroll of the mine owner. This could explain the plaintiff's reference to "Barney Sustak" (phonetic) as "some kind of a contractor" and his sudden suggestion, while testifying that he was not employed by a coal company mine owner (R. 61, 62). However, this is doubtful in the case of the plaintiff because the use of "contract miners" prevailed more generally in the northern anthracite field as opposed to the southern anthracite field where the plaintiff worked and resides.

However, in the southern anthracite field employment by a "contractor" arose when strip mine operations were delegated by coal operators to those owning specialized equipment who themselves hired their own employees. Such individuals and companies were also known as "contractors"—stripping contractors. It is again doubtful that

---

1. Quite obviously the true facts are not stated in the employment affidavits submitted on behalf of the plaintiff.

this accounts for plaintiff's sudden reference to employment by a "contractor" since he makes no reference to strippings or stripping operations or employment in connection therewith.

In one other instance was the use of the term "contractor" prevalent for a period of time in both the northern and southern anthracite fields. It grew out of conditions during the so-called "Great Depression" when legitimate mines operated on a broken schedule of one, two and three days a week. Work forces were reduced and those employed found it impossible to live on wages earned. Employed miners sought additional employment and unemployed miners, equipped and talented to do nothing but mining, resorted to so-called coal "bootlegging". It consisted of nothing more or less than going upon coal-company-owned lands, even lands of a recent former employer, trespassing thereon, digging a so-called coal hole, recovering and marketing the coal. The so-called "bootleg coal industry" grew notwithstanding efforts to patrol the properties, arrest and prosecute the trespassers. The $10.00 fine imposed by law for trespassing upon the property of another represented no deterrent and juries of their peers refused to convict on charges of larceny. Those formerly known as "coal bootleggers" began to call themselves "independent miners", formed their own organizations, developed sufficient truckers to transport their product to market and ultimately received leases to their operation in return for the payment of royalties to the property-owner. In due time, as leases were executed to and with an individual previously operating as a "bootlegger", he became known as an independent "contractor".

Such "contractor", depending upon the size of his operation, then hired one or more miners to help him. They either became employees of the "contractor"-lessee, or they shared profits with him. Whatever the arrangement, the term "contractor" was the accepted reference to the individual holding the lease and responsible to the coal company property-owner for the payment of royalties. If "Barney Sustak" (phonetic) (R. 61) was such a "contractor" by whom plaintiff was employed in the mines, as a miner, then he should have an opportunity to so explain. If he does so and if Barney Sustak (phonetic) is available and can be located to corroborate plaintiff's testimony, the plaintiff may be hard put to explain his testimony, already of record, making reference to specific employment at specific collieries and breakers where a "contractor", as described, would *not* have been involved.

We shall, accordingly, remand the record to give the plaintiff an opportunity to locate Barney Sustak (phonetic), if available, and establish his employment as a "miner" either through the testimony of such alleged employer or available records, if any. We cannot, as he would have us do, accept his *original* employment testimony as substantial and controlling over the change in his testimony reflected in his examination by the ALJ (R. 61, 62) who conducted the hearing fairly and impartially.